The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. All right. Good afternoon, Counsel. This is case number 4-21-0620, People v. Charles Watts. Counsel, could you identify yourself for the record, first for the appellant? Yes. My name is Gilbert Lenz from the DePaul Legal Clinic for Charles Watts. Thank you. And for the appellate? My name is Douglas Malcolm for the state. Thank you. Mr. Lenz, you may proceed. Thank you, Your Honor, and good afternoon to the court and to counsel. Again, Gilbert Lenz for Charles Watts. There are two issues before the court, but I'd like to focus this afternoon on the first issue regarding the sufficiency of the state's evidence, although I'd be happy to answer any questions the court has about the sentencing argument. This court should reverse Charles Watts' conviction because it rests upon a single unreliable eyewitness identification made in court more than 16 months after the incident. That identification was already unreliable because it was merely an in-court identification so long after the incident, but it was also from a witness who was intoxicated at the time of the incident and whose testimony about the incident had so many inconsistencies that it so affected his general credibility that his ultimate identification was not reliable. Because Mr. Trotter's testimony was not credible in general, this court should already find that evidence was insufficient, but largely because of that lack of credibility, his testimony about the identification also fails the Biggers factors, and for both of those reasons, this court should reverse Watts' conviction. What specific Bigger factor do you believe is missing here or should be underscored for our review? Well, there are five separate Biggers factors. For today, I've sort of grouped them into two different categories in combination with the other factors that the court should consider in the Biggers analysis. The first is the time and opportunity that Trotter had to observe the offender. The court found after the trial that Trotter had an ample opportunity to view the offender, but I think that finding was contradicted by the record and by the court's pre-trial finding. Trotter himself testified that when the offender knocked on the door, he looked at him only for a moment before letting him in. And then by Trotter's own words, he stopped paying attention to the man after he entered. Mr. Rozicki was- Counsel, can I stop you there just for one moment? I know you take issue with that, that there wasn't sufficient opportunity, but when you think about someone answering the door and opening the door and someone is outside, the two people are in very close proximity. There was no indication here that the lighting was insufficient or that there was some other impairment to Trotter's view. He answered the door and looked at the person standing outside the door. Why is that insufficient? It's insufficient because while he was able to see the person who was at the door, his testimony about the rest of the incident is so incredible that it's hard to lend weight to his later tentative identification of the person at the door as having the nickname LC. Mr. Rozicki was in the apartment the entire time as well as the offender, and the court found that Mr. Rozicki only had a brief opportunity to look at the offender. So while the record indicates Trotter was closer to the offender at the door, I don't think that the court's finding after the trial that he had an ample opportunity to observe was accurate given the court's own pretrial finding and the fact that Trotter himself acknowledged that once the person entered the apartment, he stopped paying attention to him. Well, this is the thing I'm having trouble with. Are you saying that it requires a substantial period of time for one person to look at another person in order to be able to later make an identification? I mean, what if it's just two people who's at the doorway? Why isn't that sufficient? You seem to place a lot of emphasis on the time that Trotter was in proximity to this person when it seems like identification of an individual can be based on something, a time period that's very short. Why am I wrong? And before you answer that, Mr. Lynch, let me add to Justice Harris' comment because he's in the apartment, as Trotter testified, for about 15 to 20 minutes. And they're looking at each other. He testified that he bumped and brushed past him walking in. So in answer to that question, let's also address the issue that they're in the apartment, they're in close proximity to each other for 15 to 20 minutes. Well, I think Trotter's testimony about the 15 to 20 minutes is not completely credible, given that Riziki said the offender was only there briefly and the court said the person was only there briefly before the trial. But more importantly, Your Honors, the amount of time here has to be balanced with the other factors that were present. Trotter was, the record indicates that Trotter was intoxicated at the time the person knocked on the door. Heiser and Riziki both testified that they had been drinking. Riziki said they'd been drinking a lot before the shooting. Trotter actually told the detective that he had been drinking before the shooting. And yet at trial, he denied that he had been drinking. And that's important here in two ways. First, the record shows he was intoxicated, which affects his ability to observe. And second, his denial at trial of his intoxication calls into question his general credibility. And that's crucial here, his general credibility. What is there in the record that evidences Trotter's intoxication? You say the record establishes his intoxication. What are you referring to? Well, he told the detective hours after the incident that he had been drinking with Heiser and Riziki prior to the shooting. Heiser and Riziki both corroborated that. And Riziki added that they had been drinking quite a bit of alcohol prior to the shooting. So I think the only reasonable reading of the record is that he had been drinking alcohol at least and was to some degree then intoxicated. And then again, going back to his denial of that at trial, that's key here because it calls into question his general credibility, which was even more called into question by his clearly faulty recollection of the incident subsequent to the first shot. Without any support from other evidence, Trotter said that as he fled the scene, the offender fired two more shots at him. And I think there's no other way to say it, that's just completely wrong based on this record. And his misrecollection of such a weight, you can lend Trotter's other testimony. And you say that because there was no corroboration by finding more shell casings and the witness that was one block away, she was a block away. Is that the basis for saying that it was an incredible statement by Trotter? Those two facts and Riziki, who was standing in the apartment when the first shot was fired, he also testified there was only one shot fired. So I think specifically on that, are you saying he was questioned about the number of shots and said there was only one? I don't know if he was asked if there were more than one shot, but he only testified to seeing or hearing one shot. Hezer only testified to seeing or hearing one shot and the police, the police were questioned about the thoroughness of their search. And they said they searched in the apartment, in front of the apartment, the parking lot, the area, and they found no other evidence of any other shots being fired. So I think that this record indicates that Trotter's testimony about the first shot was simply incredible. And again, that's such a remarkable fact to be misremembered raises a lot of doubt about his general credibility. Counsel, am I correct that the record shows that Trotter was previously acquainted with the person who shot him? Well, the degree of that acquaintance is unclear, Your Honor. So his initial reaction after he was shot was to give a general physical description of the shooter. He said it was someone he had seen before. A few hours later, he gave the police the nickname of shooter as LC. But I think his degree of... That was the defendant's nickname, wasn't it? According to both Hezer and Detective Dudley, they knew Mr. Watts as LC, yes. Okay, go ahead. But the degree, so the key here is the degree of Trotter's familiarity. Now, Trotter may know someone as LC, he may have recognized the shooter, but the key here is the state proved that Mr. Watts was LC and LC was the shooter. And I think Trotter's testimony indicates some lack of familiarity with the person. He may have had a vague recognition of him, but if it was someone he knew very well, he would have told the police right away who that person was. How well do you have to know someone before the description of previously acquainted of Watts? Well, you can certainly rely on... Well, it was an unspecified previous acquaintance. He actually testified or the officer of Cleveland testified that Trotter told him the person that had tried to rob him on a prior occasion. The reason I emphasize this is because I've been on this court a long time dealing with criminal cases and it's not uncommon that we have issue raised about the claim of misidentification. Typically, as you know, that's because of the crime of, let's say, armed robbery being committed over a counter in some liquor store where the victim clerk doesn't know and has never seen the person before and subsequently it's a lineup or the person is identified as the guy who committed the crime by the victim. And we're talking about a few seconds, sometimes no more than a few minutes at most of opportunity to see, but no prior acquaintanceship of any kind. The reason I mentioned this is I'm not aware of any case, and I don't think you cited any case, where any court of review has ever deemed a identification by a victim in a crime, as in this case, to be not sufficient, not credible, not sufficient to carry the state's burden of proof beyond a reasonable doubt, whereas here there was a prior acquaintanceship between the victim and the assailant. Are you aware of any? I believe the Smith case that we rely most on in our brief is one of those cases, Your Honor. In the Smith case, the eyewitness, the sole eyewitness who identified the defendant as the shooter had known the defendant for, I believe, more than two years and much closer, I think, in fact, than Mr. Trotter knew this LC. In Smith, despite the fact that that witness knew the defendant, the Supreme Court reversed that conviction. It's key here because what the Smith court said was the reason that witness was so incredible was because of her misrecollection of the incident based on the other evidence in the record. They seem like minor points, but what the Supreme Court emphasized was that this witness said the defendant was alone in the parking lot. Every other witness said there was a group. This witness said the defendant came out of one door. Every other witness said the defendant came out of a different door. And based on those two facts, the Illinois Supreme Court unanimously held that those were the two main reasons why that witness's testimony was not credible despite her familiarity with the defendant. So I think this case, it doesn't share every fact with Smith, but it's factually analogous on those crucial points. Mr. Trotter's testimony, his recollection of the incident, was similarly non-credible to the Smith witness. Well, the other aspect of this case is that this is a bench trial. We have an experienced trial court who's hearing all this and weighing all this. And before we were blessed with these jobs, we were all trial court judges ourselves and had occasion to make this kind of a determination. And trial judges have a lot better opportunity to see and evaluate people than we do from a cold record. This court heard this defendant, and heard Trotter, I should say, and notwithstanding all the deficiencies she pointed out, concluded that the state, based primarily upon his testimony, had proved the defendant guilty of the unreasonable bail. Why shouldn't we refer to that determination under the circumstances in this case? Well, I think one reason is the trial court's own pre-trial rulings. When the court suppressed Rozicki's coerced identification, it cited several factors in suppressing his identification. One of the key factors the court cited in suppressing that was the suggestive nature of the police identification procedures. Because just like with Trotter, I mean, just like with Rozicki, Detective Dudley, when Trotter told Detective Dudley that he thought the shooter was someone he knew as LC, Detective Dudley, his immediate reaction was to tell Trotter, oh, that's Charles. And Trotter acknowledged at trial that from that moment on, he knew the difference. Was there any dispute that the defendant didn't go by the nickname LC? No, there was evidence that he goes by the nickname LC. He never acknowledged that himself, but there was evidence that he did. But the key here is Trotter's familiarity with the person he said was LC. Yeah, but the detective's attachment of a name to the nickname LC, how did that somehow nullify Trotter's identification of the defendant? Well, definitely nothing nullifies the identification. Or impair it. I'm sorry. Yeah, or impair it. It nullifies too strong a word. The reason it raises further doubts about identification is because when Detective Dudley heard, Detective Dudley believed that this LC person was Charles Watts. What Detective Dudley did not do, just as he did with Rozicki, I'm sorry, not unlike as he did with Rozicki, he did not show Trotter a photo array. He did not show Trotter a lineup photo in the hospital or anything. He just told Trotter the shooter was Charles. And Trotter admitted at trial from that moment on, he knew the shooter was Charles. The next time he was asked about who the shooter was, on the record at least, was at trial 16 months later when he's in a courtroom in the case of people be Charles Watts, and Charles Watts is the only person in black and white stripes. So courts have cited, like the Ash Court and other courts, they've cited the fact that police procedures were suggestive as one of several factors that might render an identification unreliable. And I think it's a crucial fact in this case because they had ample opportunity to get Trotter to make a pretrial identification of the shooter and they just did not do so. And actually that raises questions about their confidence in Trotter's ability. Like if they believed 100% certain that he would be able to identify the shooter in an array, I think they probably would have done that. And here we're left wondering why they didn't do that. And so thereafter the motion to suppress was denied, then the court heard further testimony at trial, and that's when Trotter testified at some length. I'm sorry, can you repeat that, Your Honor? Yes, after the motion to suppress was denied, a bench trial was conducted at which Trotter testified at some length. The motion to suppress was granted as to Rosicki, there was no motion to suppress as to Trotter. But yes, yes, Trotter, right, Trotter was the principal witness at trial. Yeah, I misspoke. So Trotter's the principal witness and notwithstanding the evidence presented in the motion to suppress, the trial court is now hearing this testimony from Trotter. And this is what the court heard immediately before the court's decision, why shouldn't we give weight to the court's assessment of Trotter's credibility? Well, this court definitely under the standard of view must give weight to the trial court's factual findings and credibility determinations. But this court cannot simply rubber stamp a finding that the record shows is unreasonable. And I think Trotter's testimony was so unreasonable on so many crucial points that it rendered the state's evidence in this case simply insufficient. The state's conviction here rested, really the bedrock is Trotter's identification. And without that identification, without that identification being reliable, there simply cannot be enough confidence in this conviction to let it stand. And I think the trial court's findings to the contrary in this case were unreasonable. And that's why this court should reverse Watts' conviction. If there are no further questions, I'll reserve a remainder for rebuttal. All right. Thank you. You may. Mr. Malcolm. Thank you. May I please the court, counsel? The evidence at trial was sufficient to find the defendant guilty beyond a reasonable doubt. This court's questions have already largely teased out the meat of my argument. So I will endeavor to keep my comments short and concise and to the point. On appeal, the standard is whether any rational trier of fact viewing the evidence in the light most favorable to the state could have found the defendant guilty beyond a reasonable doubt. It is not the role of this court to retry the defendant and the credibility determinations of the trier of fact below receive great deference because the trier of fact below is better positioned to make those credibility determinations. Here, the trial court found James Trotter to be credible because when James Trotter answered the apartment door, he stood approximately two feet away from the defendant. He knew the defendant from their prior interactions. He knew him as LC. And when the defendant entered into the apartment, he brushed past Trotter and Trotter had another opportunity to see him during that instance. They remained relatively close proximity for the next approximately 15 minutes before Trotter, before the defendant pulled out a gun and shot Trotter. This identification was clear. It is credible and the trial court's credibility determinations specifically finding that Trotter had ample opportunity to observe the defendant was reasonable and accordingly should not be reversed on appeal. In his brief, the defendant argues that his alibi was not undercut by the state's evidence. The state respectfully disagrees. The surveillance video of the defendant's apartment complex shows that the defendant left his apartment at approximately 630 and did not return until approximately 930. What should we make of that surveillance video just in terms of the individuals that were depicted? The officer wasn't able to make a an identification based on seeing someone's face in the video, but commented about how they were the individuals carrying himself as mannerisms. Is that worthy of evidential equality to where the officer can then say that was the defendant? Yes, your honor. If an individual either has particularly notable or is identified by their physicality, their stature, their shape, their mannerisms, also based on their prior interactions where an officer or detective can identify an individual based on those particular characteristics, that is sufficient and appropriate for testimony identifying an individual. So defendant didn't have a limp or some obvious disability that then would have been apparent in this surveillance video. What did the officer say was of such a distinguishing characteristic about the way this person moved in the video that he knew that it was the defendant? If I recall the exact testimony correctly, I don't believe that there was any one particular thing that the officer highlighted. However, the officer did list stature, physicality, and mannerisms. So it was, to the best of my understanding, reading the cold record, a matter of the way the defendant appeared, the way the defendant moved, was familiar to Detective Dudley based on their prior interactions. And to be fair, it wasn't just the individual's mannerisms there, but it was also what the individual was wearing, where he came from and went and returned to, and then also the vehicle in which the individual got into. Yes, your honor. The individual appeared to leave apartment three and then returned to apartment three, which was known to be the defendant's apartment. Also, he got into a vehicle that was connected with the defendant. All of this evidence, viewed in the light most favorable to the state, was sufficient to find the defendant guilty beyond a reasonable doubt. Quickly, on issue number two, the trial court did not use discretion during sentencing. The record shows the trial court considered all the appropriate factors in aggravation and mitigation. And regarding the particular factors that the defendant includes in his opening brief, those were included in the pre-sentence investigation report, which the trial court explicitly stated that it considered. The trial court is presumed to know the law and apply it properly, and the record does not rebut that presumption. And accordingly, the defendant's sentence was an appropriate use of the trial court's discretion, not an abuse thereof. If there are no further questions from this panel, the state respectfully passes on the remainder of its time. All right, thank you, Mr. Malcolm. Mr. Lenz, rebuttal arguments. Yes, thank you, your honor. I'll rest on the briefs as for the sentencing. On the Justice Harris, the question was getting to a key point about Detective Dudley's ability. The state certainly could have asked Detective Dudley how he knew Mr. Watts, what his basis of familiarity was, but he just said he just kind of had a general familiarity with him. And based on that, he was able to identify his stature and walking style in the video. I just think that's simply not enough to render, and that's the only identification made of the person in the video on this record, so it's just simply not enough to show that that was Mr. Watts in the video and does not outweigh his alibi, which was corroborated by his girlfriend who testified that he was there most of the day and only left for the store. One final point on Trotter's identification. Again, there's no question that Trotter, a few hours after the shooting, told Detective Dudley that... I apologize, but I don't want you to get off of the surveillance video because there was a key part for the trial court. What about the fact that, as the trial court considered here, that the two individuals, let's assume for purpose of your argument that he cannot make the adequate identification that it is the defendant, but he's later arrested in the same car. It leaves the house about the same time and returns. There was other factors that supported the officer's position that it involved Watts, that Watts was the one leaving that apartment. Could you address that before you move on to your next item? Yeah, no question, Justice Bridges, that there was some circumstantial evidence indicating that one of the people could have been Watts. I would note first that the video shows him, the car that he left in or that the two people left in was not the same car he was later arrested in. That car was apparently the car that one of the people returned to the apartment in. So there were two different cars involved here on the outgoing and incoming trips. But setting that circumstantial evidence, especially given that it was Watts' apartment. But on the other hand, that evidence is not worthy of a great deal of weight given its vagueness and given the unreliability of Dudley's identification of the person in the video. But counsel, it does attack the alibi. You said it doesn't have much weight, but if the trial court is weighing all of this evidence, it clearly addresses the alibi presented by the witness. And it was the state's burden to disprove. So Watts offered an alibi in the statement to the police and it was corroborated by trial testimony. It was the state's burden to disprove that alibi. And I just don't think that the circumstantial evidence of the video and Dudley's unreliable identification testimony about the video met that burden. And just to conclude on really the crucial factor in this case, which was Trotter's identification. Again, Trotter did not, we know Trotter wasn't very familiar with the person at the door because he would have been able to identify the person right away to Officer Cleveland if he was very familiar with him. Instead, it took him some time to come up with what he believed to be the person at the door. The police did not at that moment then try to figure out who Trotter meant to be LC by showing him an array or a lineup photo. The police told him that the shooter was Charles and they never asked him again until trial who the shooter was when Charles Watts was the only person in the courtroom wearing black and white stripes. It just, there's certainly a standard review, but the Trotter's testimony in this case simply was not sufficient to provide a reliable identification. And this court should reverse Mr. Watts's conviction. All right. Thank you, counsel. Thank you both. The case will be taken under advisement and the court will issue a written decision.